**Thomas KROPP, Plaintiff,**

v.

**Gary McCAUGHTRY and Lynn Oestreich, Defendants.**

**No. 92–C–895.**

United States District Court,
E.D. Wisconsin.

Feb. 8, 1996.

Thomas Kropp, Waupun, WI, pro se.

Paul L. Barnett, Assistant Attorney General, Madison, WI, for Defendants.

### MEMORANDUM AND ORDER

WARREN, District Judge.

Now before the Court is the defendants' motion for summary judgment seeking the dismissal of the above-captioned civil rights action. The plaintiff, Thomas Kropp, has commenced this action *pro se* pursuant to 42 U.S.C. § 1983, alleging he has been subjected to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. For the following reasons, the defendants' motion will be granted and this case dismissed.

## I. FINDINGS OF FACT [1]

Plaintiff Thomas Kropp is currently incarcerated at the Waupun Correctional Institution (WCI) in Waupun, Wisconsin. (Defendants' Proposed Findings of Fact (DPFOF) ¶ 2.) Defendant Gary McCaughtry is the warden of Waupun Correctional Institution. (DPFOF ¶ 3.) Defendant Lynn Oestreich was the security director of Waupun Correctional Institution at the times relevant to this action. (DPFOF ¶ 4.)

Wis.Admin.Code § DOC 303.69 provides for the major penalty assessment of adjustment segregation, not to exceed eight days. Wis.Admin.Code § DOC 303.70 provides for the major penalty assessment of program segregation. A penalty assessment of adjustment segregation and program segregation may only be imposed for a major offense by the adjustment committee or hearing officer. (DPFOF ¶ 7.) Inmates housed in the segregation units, which include the adjustment center building and the north program cell hall, are considered to be among the most problematic inmates in the institution. (DPFOF ¶ 8.) Inmates subject to segregation have been found guilty of committing one or more rule violations. (DPFOF ¶ 9.)

---

**1.** The plaintiff has failed to respond to the defendant's proposed findings of fact and has failed to introduce any evidentiary material in support of his claim. Accordingly, the Court will adopt the factual findings proposed by the defendant. *See* Local Rule 6.05(d) (E.D.Wis.). *See also Doe v. Cunningham*, 30 F.3d 879, 882–83 (7th Cir. 1994).

Defendant Oestreich discussed with staff ways to reduce the potential of inmates in segregation spitting and throwing items out of segregation cells. It was not uncommon for segregation inmates to spit at and/or throw urine, feces, hot coffee, drinking cups or food trays out of their cells as other inmates and staff passed their cells. (DPFOF ¶ 10.) A decision was made to add an expanded metal front on to each cell which would reduce the potential of inmates spitting and throwing items out of their cells. (DPFOF ¶ 12.) Defendant McCaughtry approved of the project request which was sent to the facilities management division in Madison for approval of construction in the disciplinary segregation units related to the security concerns of prison staff. (DPFOF ¶ 13.) In April 1992, the security related remodeling of the adjustment center began which involved the attaching and painting of an expanded metal front on each cell door. (DPFOF ¶ 14.)

On July 3, 1992, plaintiff Thomas Kropp was admitted to WCI. (DPFOF ¶ 19.) On July 10, 1992, Kropp received a penalty disposition of three days adjustment segregation and 90 days program segregation, and five days adjustment segregation after being found guilty of violating Wis.Admin.Code § DOC 303.28, disruptive conduct, for two separate conduct reports. (DPFOF ¶ 20.) Kropp was housed in the adjustment center in cell number 20, from July 10 to July 18, 1992, to serve his eight days adjustment center sentence. (DPFOF ¶ 21.) On July 18, 1992, Kropp began serving his program segregation sentence in cell number 20 in the adjustment center. (DPFOF ¶ 23.) On July 21, 1992, Kropp was transferred to north program segregation, cell number C–25 to continue serving his program segregation sentence. (DPFOF ¶ 24.)

The security-related remodeling of the adjustment center cells was completed the week of July 12, 1992. (DPFOF ¶ 22.) On July 27, 1992, the security related remodeling of the north cell hall began. (DPFOF ¶ 25.) The remodeling of the adjustment center and program segregation cells involved grinding the edge of each cell so that the expanded metal door front could be welded on with a wire welder, and applying NoSand to the cell front prior to painting so that the paint adhered to the surface. (DPFOF ¶ 27.) Five cells were worked on at a time at various stages of grinding, welding or painting. If facing the cells being worked on, the cell to the left was empty and used as the "buffer" cell to provide one cell between an inmate-occupied cell and the cell being ground. The second cell was prepped (ground), the third cell was welded, the fourth cell was painted, and the cell to the far right was used to hold the equipment while the construction of the cells was taking place. (DPFOF ¶ 28.)

Inmates were removed from the cells that were being worked on, and there was always at least one empty cell between the cells being ground, welded and painted, and the inmate in the next cell. (DPFOF ¶ 29.) Remodeling of the cells was done on a five-hour basis from approximately 8:00 a.m. to 2:00 p.m., as time allowed and with a one-hour break for lunch. The remodeling project was not done on Saturdays and Sundays. Due to other duties of the remodeling crew, work was not always done Monday through Friday. (DPFOF ¶¶ 30–31.) Gas masks were not required, nor worn by the welding and painting crew to weld the edge of the cell, weld on the door, and paint the cell door. (DPFOF ¶ 32.) However, the remodeling crew who did the grinding and welding were required to wear and did wear welding helmets to protect their face during the grinding and welding. (DPFOF ¶ 33.) The remodeling crew wore ear plugs. Ear plugs were made available to any inmate who requested ear plugs during the remodeling of the north cell hall. (DPFOF ¶ 35.) There were no dangerous gas fumes from the welding and grinding and there were no harmful welding flashes as a result of the remodeling project. (DPFOF ¶ 34.) During the remodeling of the cell hall, the windows were open and the ventilation system, consisting of four heating and ventilating units and three exhaust fans, along with two thirty-inch pedestal fans, was operating in order to ventilate the cell halls. (DPFOF ¶¶ 36–40.) The exhaust system in the segregation units provided adequate ventilation. (DPFOF ¶ 42.)

On August 5, 1992, a number of inmates in north program segregation area complained about a strong smell of paint thinner. Security supervisors were notified and responded by moving inmates with asthma to cells closer to the windows on the other side of the cell hall, and allowing the inmates who required inhalers to keep the inhalers in their cells. Security supervisors also called staff from the health services unit to come to the unit to check on all the inmates. It was also ordered that the paint being used be discontinued. (DPFOF ¶ 43.) Kropp was seen by health services staff on that day in response to an emergency call from cell hall staff, offered no complaints and told the nurse that he was "OK." (DPFOF ¶ 44.) Kropp did not complain to the health services unit about any ill effects due to the remodeling of the north program segregation unit during the duration of the plaintiff's incarceration at WCI until his transfer to Kettle Moraine Correctional Institution on December 8, 1992. (DPFOF ¶ 45.) Captain Garro, the program captain, made daily rounds of the north program segregation unit to address complaints concerning the construction, and at no time did Kropp inform Captain Garro that he had any complaints concerning the construction. (DPFOF ¶¶ 46–48.) On November 2, 1993, the security-related remodeling of the north cell hall was completed. (DPFOF ¶ 49.)

While inmates in the general prison population may exercise several times a week outdoors, inmates in adjustment segregation status are not allowed out-of-cell exercise. (DPFOF ¶¶ 52–53.) Inmates housed in the adjustment center building who are in program segregation status are allowed to exercise in the indoor exercise modules for thirty minutes a day, time permitting, excluding Wednesday, Sundays, and holidays. (DPFOF ¶ 55.) Inmates in temporary lockup and program segregation status who are housed in the north cell hall are allowed to exercise outdoors for thirty minutes a day, time permitting, excluding Wednesday, Sundays, and holidays. (DPFOF ¶ 56.)

Prior to April, 1992, program segregation inmates who were housed in the north cell hall, exercised outdoors, five inmates at a time in one common exercise area. However, the practice of allowing these inmates to exercise together was compromising the safety of inmates as well as the safety of staff who had to intervene during the altercations that ensued. (DPFOF ¶ 57.) A project request was approved by the warden and central office to build individual outdoor exercise modules to allow program segregation inmates an opportunity to exercise outdoors in a more secure environment. (DPFOF ¶ 59.) The construction of twenty-five individual outdoor recreation modules began on April 6, 1992, and was completed on September 30, 1992. (DPFOF ¶¶ 60, 69.) Thus outside recreation ceased temporarily for north program segregation inmates in order to construct a safe and secure place to exercise outdoors. (DPFOF ¶ 64.)

Kropp was in program segregation status in the north cell hall for thirty days, from July 21, 1992 until August 20, 1992 during the construction of the outside recreation modules when outdoor recreation ceased. (DPFOF ¶ 66.) Once Kropp was transferred out of program segregation status on August 20, 1992, he could exercise several times a week outdoors as a general population inmate. (DPFOF ¶ 68.) While Kropp was in program segregation status in the north cell hall for thirty days, showers were run twice a week on Wednesdays and Sundays. (DPFOF ¶¶ 70–71.) From July 21, 1992 until August 20, 1992, while Kropp was in program segregation status, linen, including one sheet, pillow case, hand towel, washcloth, khaki pants, and handkerchief, was exchanged once a week. (DPFOF ¶ 72.) Showers and linen exchange were not withheld during the construction. (DPFOF ¶ 73.)

On August 24, 1992, Kropp filed a *pro se* 42 U.S.C. § 1983 civil rights complaint alleging that he was subjected to cruel and unusual punishment and that he was denied access to the courts. The Court granted Kropp's Petition to Proceed *In Forma Pauperis* on his Eighth Amendment claims but denied without prejudice Kropp's claim that he was denied access to the courts for failure to allege that his inability to use the law library was in any way detrimental to any pending or contemplated litigation. On September

29, 1995, the defendants filed a Motion for Summary Judgment. On October 23, 1995, the plaintiff filed an unsigned two-page document. On November 8, 1995, the defendants filed a reply brief. This case is fully briefed and ready for review and resolution by this Court.

## II. LEGAL STANDARD

 Summary judgment is no longer disfavored under the Federal Rules. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) ("Summary judgment procedure is properly regarded as an integral part of the Federal Rules as a whole which are designed 'to secure the just, speedy and inexpensive determination of every action.' "). Indeed, Federal Rule of Civil Procedure 56 requires a district court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

 The party moving for summary judgment bears the initial burden of showing that there are no material facts in dispute and that judgment should be entered in its favor. *Hannon v. Turnage,* 892 F.2d 653, 656 (7th Cir.1990), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). A defendant moving for summary judgment may satisfy this initial burden by pointing to a plaintiff's failure to introduce sufficient evidence to support each essential element of the cause of action alleged. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553–54. A

party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials," but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Becker v. Tenenbaum–Hill Associates, Inc.,* 914 F.2d 107, 110 (7th Cir. 1990). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

 In evaluating a motion for summary judgment, the Court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir.1989). "However, we are not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) (citation omitted).

## III. DISCUSSION

 To maintain a cause of action under section 1983 based on violations of the Eighth Amendment, a prisoner must satisfy both an objective component—"was the deprivation serious enough?"—and a subjective component—"did officials act with a sufficiently culpable state of mind?" *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). Extreme deprivations are required to satisfy the objective component in a conditions of confinement case. *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992). The Eighth Amendment " 'does not mandate comfortable prison conditions,' . . . and only those deprivations denying the minimal civilized measure of life's necessities,' are sufficiently grave" to state a cognizable section 1983 claim based on the Eighth Amendment. *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 347, 101 S.Ct. 2392, 2400, 2399, 69 L.Ed.2d 59 (1981)).

The subjective element of the claim may be satisfied by a showing of "deliberate indifference" on the part of the prison officials. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Wilson*, 501 U.S. at 303, 111 S.Ct. at 2327 (quoting *LaFaut v. Smith*, 834 F.2d 389, 391–92 (4th Cir.1987) ("Whether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard."). The Seventh Circuit has defined "deliberate indifference" as akin to criminal recklessness: that is, where "the defendant has deliberately committed an act that is at once socially costless to avoid ... and highly dangerous." *Duckworth v. Franzen*, 780 F.2d 645, 652 (7th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). Thus, an Eighth Amendment violation "requires, at minimum, that the prison officials have realized there was imminent danger and have refused—consciously refused, knowingly refused—to do anything about it." *Campbell v. Greer*, 831 F.2d 700, 702 (7th Cir.1987). *See also DeMallory v. Cullen*, 855 F.2d 442, 445 (7th Cir.1988).

Accordingly, the Court concludes that Kropp has failed to demonstrate that there is a genuine issue for trial regarding the objective or subjective component of the Eighth Amendment test. As both components must be demonstrated before relief can be granted, the Court need only reach the first objective component in order to determine that defendants are entitled to judgment as a matter of law, however, the Court will address the absence of evidence supporting either prong of the test.

The Constitution does not require that prisons be comfortable, and the fact that prison conditions are sometimes harsh is part of the price that convicted individuals and pre-trial detainees must pay for their charged offenses. *Rhodes v. Chapman*, 452 U.S. 337, 347–49, 101 S.Ct. 2392, 2399–2401, 69 L.Ed.2d 59 (1981). Conditions of confinement may rise to the level of a constitutional violation only if those conditions involved the deprivation of a single identifiable human need or the denial of the minimal civilized measure of life's necessities. *Wilson*, 501 U.S. at 298–305, 111 S.Ct. at 2324–27. Courts have found sufficiently serious deprivation in, *inter alia*, denial of medical care, *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292, generally unsanitary conditions, *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir.1992), and prolonged restrictions on physical exercise. *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir.1985), *cert. denied*, 479 U.S. 817, 107 S.Ct. 77, 93 L.Ed.2d 32 (1986). Deprivation of exercise may amount to a constitutional violation if an inmate's muscles are allowed to atrophy or if an inmate's health is threatened. *Id.* at 1255. Inadequate ventilation may also amount to a constitutional violation if the inadequacy is harmful or causes injury. *Martin v. Tyson*, 845 F.2d 1451, 1456 (7th Cir.), *cert. denied*, 488 U.S. 863, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988) (citing *Shelby County Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir.1986)). However, Kropp has failed to present any facts implicating a constitutional violation where he was denied a basic human need or suffered an injury.

Moreover, an Eighth Amendment violation may only be established if pain or an injury was intentionally inflicted or deliberate indifference was shown to a prisoner's serious medical needs. *Estelle*, 429 U.S. at 104–05, 97 S.Ct. at 291–92. *See also Hudson*, 503 U.S. at 5, 112 S.Ct. at 998. To establish deliberate indifference, the plaintiff must demonstrate that the defendants were aware of imminent danger and consciously or knowingly refused to do anything about it. *Campbell*, 831 F.2d at 702. There is absolutely no evidence that prison officials acted intentionally or with deliberate indifference regarding plaintiff's complaints.

The undisputed facts demonstrate that Kropp was in the adjustment center for two or three days while the construction of the cells took place. Kropp was placed in adjustment segregation on July 10, 1992, and the construction of the cells in the adjustment center was completed on July 12, 1992. The construction of an expanded metal front on cell doors was a necessary measure in response to the disruptive behavior of inmates in segregation spitting and throwing items at

staff and inmates. On July 21, 1992, Kropp was transferred to the north cell hall to continue serving his imposed program segregation term. Remodeling of the north cell hall began on July 27, 1992, and ended on November 2, 1993. Kropp was returned to the general prison population on August 20, 1992, and therefore endured construction for less than one month while in adjustment and program segregation.

The Court acknowledges that while construction commenced, prison conditions during the construction were probably at times vexing and bothersome to both inmates and staff. However, the prison conditions, while somewhat trying, were not overly burdensome and certainly did not violate the Constitution. Again, the Court emphasizes that the construction project was necessary to ensure the future safety and security of staff and inmates as they passed in front of segregation cells. The construction lasted for six hours each day with a one-hour break for lunch. Although the construction workers wore welding helmets, inmates were housed at least one cell removed from the work and consequently did not require helmets for their safety. The construction work on the cells did not require the workers to wear gas masks, therefore, the inmates did not need gas masks. Moreover, inmates were supplied ear plugs upon request. During the construction, staff conducted daily rounds to address inmate complaints. Kropp was examined by a member of health services staff and indicated he was "OK." Under these undisputed facts, there is no evidence to support the objective component of an eighth amendment violation. Furthermore, there is no evidence suggesting deliberate indifference on the part of prison officials. There are no facts to indicate that defendants completely disregarded or ignored plaintiff's safety. In fact, the undisputed evidence demonstrates that prison officials responded to the complaints of inmates (Kropp did not complain) and instituted appropriate measures to ensure the safety and relative comfort of inmates during necessary construction. In the absence of any evidence or facts indicating a deliberate failure to make any effort to minimize serious risks to inmates (and the Court has discerned no serious risks), Kropp cannot prevail at trial.

 As to his challenges to recreational opportunities, Kropp was not denied the right to exercise in his cell, including running in place, sit-ups, push-ups, and stretching while he was in adjustment and program segregation. Kropp was allowed to leave his cell in order to shower and receive visitors. Moreover, once Kropp was transferred into the general prison population on August 20, 1992, Kropp was able to exercise outside several times a week. In order to secure the safety of inmates while exercising outdoors, twenty-five outdoor recreation modules were constructed necessitating that outside recreation for north program segregation inmates temporarily cease during the construction. Significantly, Kropp does not indicate that he sought medical treatment for any health problems related to lack of exercise, including weight-gain or muscle atrophy. As a result, he has no valid Eighth Amendment claim. Finally, the uncontroverted testimony is that during construction inmates were allowed to shower twice a week and clean bedding and linens were provided weekly. This arrangement clearly does not violate the Constitution and certainly does not fall beneath contemporary standards of decency.

## IV. SUMMARY AND ORDER

For the foregoing reasons, the Court concludes that no reasonable jury could return a verdict in favor of the plaintiff on the claims asserted. Mr. Kropp has failed to introduce affidavits or other evidence setting forth specific facts showing that there is a genuine issue for trial on either the objective component or the subjective component of his Eighth Amendment claim. Therefore, there are no genuine issues as to any material facts and defendants are entitled to judgment as a matter of law. Accordingly,

IT IS HEREBY ORDERED that the defendants' motion for summary judgment is GRANTED and this case is DISMISSED.

SO ORDERED.