**Willie COLLINS, Plaintiff,**

v.

**MILWAUKEE HOUSING ASSISTANCE CORPORATION, Defendant.**

No. 94–C–1252.

United States District Court, E.D. Wisconsin.

June 4, 1996.

**1156**

Willie Collins, Milwaukee, WI, pro se.

Robert K. Sholl, Steven S. Gensler, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, WI, for Defendant.

## *DECISION AND ORDER*

WARREN, District Judge.

Before the Court is the defendant's Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56(b) and Local Rules 6.01, 6.04 and 6.05, in the above-captioned matter. For the following reasons, the defendant's Motion for Summary Judgment is GRANTED and this case is DISMISSED.

## *I. PROCEDURAL AND FACTUAL BACKGROUND*

On November 14, 1994, plaintiff Willie Collins filed a Complaint alleging that the defendant Milwaukee Housing Assistance Corp. (hereinafter "MHAC") had terminated his employment based on his race in violation of 42 U.S.C. § 1981. The plaintiff is African-American. On January 9, 1995, the defendant filed an Answer, asserting that the plaintiff's position, "Resident Caretaker," had been eliminated under a corporate-wide restructuring and that no one in the "Resident Caretaker" position had been retained. The defendant also filed a counterclaim, alleging that the plaintiff owes monies for rent due and for the unlawful conversion of a refrigerator. Both parties undertook discovery, which traversed a tortuous path. On March 1, 1996, the defendant moved for summary judgment and filed a Brief in Support of Motion for Summary Judgment. The plaintiff filed a response on March 12, 1996. On March 27, 1996, the defendant replied. The plaintiff filed an additional affidavit on April 15, 1996, to which the defendant replied on April 17, 1996.

Pursuant to Local Rule 6.05(d), "assuming that a party moving for summary judgment properly supports its statement of facts by references to the record or other evidentiary material, such facts are taken as admitted by a nonmovant who fails to respond." *Lisbon Square v. United States,* 856 F.Supp. 482, 488 (E.D.Wis.1994) (citing *Appley v. West,* 929 F.2d 1176, 1179–80 (7th Cir.1991)). *See also Kropp v. McCaughtry,* 915 F.Supp. 85, 87 n. 1 (E.D.Wis.1996); *Doe v. Cunningham,* 30 F.3d 879, 882–83 (7th Cir.1994). The non-moving party cannot generally object to the moving party's proposed findings of fact. Rather, the non-moving party must specifically respond to each disputed finding of fact. *See Langenfeld v. Stoelting,* 902 F.Supp. 847, 849 (E.D.Wis.1995) ("Each specific response must include specific factual citations from the record supporting the existence of the claimed dispute."). However, "the Court must remain mindful that *pro se* litigants are treated gently," *Lisbon Square,* 856 F.Supp. at 488 (citing *Lockhart v. Sullivan,* 925 F.2d 214, 216 (7th Cir.1991)) and are "commonly required to comply with standards less stringent than those applied to expertly trained members of the legal profession." *Id.* at 489 (citing *Hughes v. Rowe,* 449 U.S. 5, 9–10, 101 S.Ct. 173, 175–77, 66 L.Ed.2d 163 (1980) and *Bates v. Jean,* 745 F.2d 1146, 1150 (7th Cir. 1984)).

Because the plaintiff has failed to file a point by point response to the defendant's proposed findings of fact, the Court will construe the defendant's proposed findings of fact as uncontested for the purpose of this motion. Local Rule 6.05(d). However, the Court is "mindful of the Seventh Circuit's instruction to treat *pro se* parties with 'kid gloves' for purposes of summary judgment." *Lisbon Square,* 856 F.Supp. at 489. In the interest of fairness, the Court will incorporate plaintiff's untimely, unauthenticated affidavit, as well as plaintiff's other proffered evidentiary documents into the record. Therefore, the Court adopts the defendant's proposed findings of fact ¶¶ 1–22, but, in the interest of fairness, will consider the plaintiff's proffered evidentiary documents, including the untimely affidavit and its attachments.

## II. FINDINGS OF FACT

By way of brief background, MHAC is a not-for-profit corporation created under the laws of the State of Wisconsin in 1989. MHAC redevelops, rehabilitates and manages urban, low-income housing. (Affidavit of Perry G. Harenda (hereinafter "Perry Aff.") at ¶¶ 2–3.) Prior to 1992, MHAC had managed only double-family residences ("duplexes") at scattered sites throughout the Milwaukee area. The leasing and day-to-day management of these duplexes was the responsibility of Ms. Alice Galloway–Torres, MHAC's general Property Manager. Fred McKnight, MHAC's general Maintenance Technician, was responsible for their maintenance and repair. (Perry. Aff. at ¶¶ 3, 8.) Beginning in 1992, MHAC undertook to expand its operations into the redevelopment and management of multiple-family residences ("apartments"). (Perry Aff. at ¶ 3.)

MHAC purchased its first apartment building on September 3, 1993. It is a 36 unit building located at 2933–37 West Wells Street in Milwaukee (hereinafter, the "2933–37 Building"). The 2933–37 Building is now part of a cluster of six different apartment buildings in the West Wells Street area that MHAC collectively markets and manages as the Garden West Village Apartments. (Perry Aff. at ¶¶ 6, 5.) MHAC planned to manage and market the apartments by geographic "cluster." Each cluster would have two full-time staff members dedicated solely to that cluster: an Assistant Property Manager and a Resident Maintenance Manager. (Perry Aff. at ¶¶ 12–14.)

The Assistant Property Manager would be responsible for all aspects of residential leasing and management of his or her cluster of apartment buildings. The Assistant Property Manager's duties included, among other things, marketing the rental units, qualifying prospective tenants, preparing and administering all leases, monitoring budgeted maintenance, repairs and cleaning, ensuring compliance with code, tax credit and WHEDA requirements, maintaining files and information, and preparing reports for occupancy, budgeting, maintenance and lenders. (Perry Aff. at ¶ 13.)

The Resident Maintenance Manager would be responsible for all aspects of maintenance, repair and cleaning for his or her cluster. The Resident Maintenance Manager's duties included among other things performing scheduled maintenance work, making regular inspection of the ground, building and mechanical systems, performing daily tenant work orders, refurbishing vacant apartments, maintaining the apartment grounds, maintaining mechanical systems and appliances, making recommendations for physical repairs, capital improvements and supplies, maintaining an inventory of tools, equipment and supplies, and maintaining service records as necessary. The Resident Maintenance Manager would work under the supervision of the Assistant Property Manager and in conjunction with MHAC's general maintenance staff and construction manager. The Resident Maintenance Manager, however, would be expected to perform these duties independently and therefore required training and experience in structural care, carpentry, appliance repair and the maintenance and repair of mechanical systems including plumbing, electrical, and heating ventilation and air conditioning ("HVAC"). (Perry Aff. at ¶ 14.)

MHAC also created a position called the Community Management Coordinator ("CMC"). The CMC would act as a social and recreational director and serve as an ombudsman with the surrounding communities. The CMC was responsible for these activities throughout all of MHAC's properties, but was to focus initially on the Garden West Village Apartments. (Perry Aff. at ¶ 15.) MHAC assigned responsibility for the leasing and management of the 2933–37 Building to Alice Galloway–Torres, MHAC's general Property Manager, and assigned responsibility for the maintenance of the 2933–37 Building to Fred McKnight, MHAC's general Maintenance Technician. (Perry Aff. at ¶ 18.)

The plaintiff was serving as an on-site Resident Manager for the previous owner when MHAC bought the property on September 3, 1993. The plaintiff was hired to perform basic cleaning and minor maintenance and to act as the "eyes and ears" of the building, since neither Ms. Galloway–Torres nor Mr. McKnight could devote their

full attention to that building. Plaintiff was compensated $500 per month and a "rent-free" apartment for these services. (Perry Aff. at ¶ 19.)

The plaintiff has an eighth grade education and has not pursued further education or trade school. The plaintiff has not served in the military. He is primarily self-educated which consists of reading books on topics such as sociology, psychology, parapsychology, and clinical hypnosis. The plaintiff also considers his education to include his personal encounter with the devil. (Deposition of Willie Collins "Collins Dep." at 131–133.) The only jobs that plaintiff can recall holding are with the MHAC and a similar position with the previous owner of the building, Metropolitan Management. (Collins Dep. at 135–6.)

During the plaintiff's tenure as Resident Manager, Ms. Galloway–Torres and Mr. McKnight continued to perform and have full responsibility for the leasing, management and maintenance of the 2933–37 Building. (Perry Aff. at ¶ 10.) Plaintiff's only "leasing" duties consisted of accepting applications and turning them over to MHAC. (Collins Dep. at 215.) His "maintenance" duties consisted of cleaning hallways and vacant apartments and performing repairs no more complicated than plunging toilets, changing locks and replacing broken windows. (Collins Dep. at 215–8.) He did not perform traditional maintenance service such as furnace work, plumbing repair, plumbing, hanging fixtures, changing outlets, or appliance repair. (Collins Dep. at 217–8.)

By the summer of 1994, MHAC began finalizing and implementing its plans for the long-term management and operation of the Garden West Village Apartments. (Perry Aff. at ¶ 11.) On August 15, 1994, MHAC hired Sister Alana Gorski. Sr. Alana holds an undergraduate degree and Masters of Arts degree in Pastoral Studies and served as Housing Manager of Assisi Homes in Milwaukee from 1988 to 1992. MHAC hired Sr. Alana ultimately to be the CMC. She agreed to perform the duties of the Assistant Property Manager, however, until that position could be filled. (Perry Aff. at ¶ 16 and Defendant's Exhibit A.)

On August 16, 1994, MHAC hired Timothy Laur to serve as Resident Maintenance Manager for the Garden West Village Apartments. Mr. Laur is a high school graduate, a graduate of Waukesha County Technical Institute and holds trade school degrees in plumbing and HVAC. Mr. Laur's resume also lists special skills in electrical work and carpentry. Mr. Laur's prior work experience includes employment as the maintenance man for Campus Circle Apartments in downtown Milwaukee. Mr. Laur is also a member of the United States Armed Forces Reserves. (Perry Aff. at ¶ 17 and Defendant's Exhibit B.)

On January 3, 1995, MHAC hired Virginia Pickens as Assistant Property Manager for Garden West Village Apartments. Ms. Pickens is a high school graduate and holds a degree in Office Administration from a commercial college. Ms. Pickens has worked in apartment management since January 1992, and has extensive experience in processing applications, office management, government reporting, and clerical administration. Ms. Pickens is an African–American female. (Perry Aff. at ¶ 18, Defendant's Exhibit C.)

Once MHAC began implementing its plans for hiring a full-time professional management and maintenance staff dedicated to the Garden West Village Apartments, it no longer needed Resident Managers in any of the individual buildings. Consequently, the position was eliminated entirely, including the plaintiff's position as Resident Manager of the 2933–37 Building. On August 15, 1994, MHAC terminated the plaintiff. As of that time, there were no Resident Manager positions for any of MHAC's apartment buildings. (Perry Aff. at ¶ 19.)

### III. LEGAL STANDARD

Federal Rules of Civil Procedure Rule 56(c) states "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment shall be granted. *Langenfeld,* 902 F.Supp. at 854 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct.

2548, 2552, 91 L.Ed.2d 265 (1986)); *Local 1545, United Mine Workers of America v. Inland Steel Coal Co.*, 876 F.2d 1288, 1292 (7th Cir.1989). "Thus, the 'plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Langenfeld*, 902 F.Supp. at 854 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.) Only "genuine" issues of "material and outcome determinative fact" will defeat an otherwise "proper" motion for summary judgment. *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir.1995) (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552), *cert. denied*, —— U.S. ——, 116 S.Ct. 1545, 134 L.Ed.2d 648 (1996). "A genuine issue of material fact exists only where there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990) (citing *Wolf v. City of Fitchburg*, 870 F.2d 1327 (7th Cir.1989)). "[M]aterial" facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla [of evidence] ... will be insufficient." *Cherry v. American Tel. & Tel. Co.*, 47 F.3d 225, 228 (7th Cir.1995) (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512). A dispute over such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Langenfeld*, 902 F.Supp. at 854 (citing *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10).

The moving party bears the burden of establishing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *see also Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553 (the moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue). The moving party may meet its burden of showing an absence of a material issue by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Vasquez*, 60 F.3d at 328 (citing *Cuddington v. Northern Indiana Public Serv. Co.*, 33 F.3d 813 (7th Cir.1994)); *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Santiago*, 894 F.2d at 221; *United Mine Workers*, 876 F.2d at 1292. "A party opposing summary judgment 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Langenfeld*, 902 F.Supp. at 855 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)). The opposing party "must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be [in dispute]." *Langenfeld*, 902 F.Supp. at 855 (citing *Branson v. Price River Coal Co.*, 853 F.2d 768, 771–72 (10th Cir.1988)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Langenfeld*, 902 F.Supp. at 855 (citing *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11).

## IV. ANALYSIS

42 U.S.C. § 1981(a) states:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**1160**

The phrase, "make and enforce contracts" refers to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The statute protects these rights "against impairment by nongovernmental discrimination" as well as "impairment under color of State law." 42 U.S.C. § 1981(c). Discrimination claims brought pursuant to 42 U.S.C. § 1981 are analyzed "in the same manner as claims brought pursuant to Title VII of the Civil Rights Act." *Bratton v. Roadway Package Sys., Inc.,* 77 F.3d 168, 176 (7th Cir.1996) (citing *Pilditch v. Board of Educ. of City of Chicago,* 3 F.3d 1113, 1116 (7th Cir.1993), *cert. denied,* 510 U.S. 1116, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994)).

◼ "Racial discrimination in an employment setting can be proved either through direct or indirect evidence." *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1113 (7th Cir.1992); *Kirk v. Federal Property Management Corp.,* 22 F.3d 135, 138 (7th Cir.1994). Because it is often difficult to find direct evidence that an employer has discriminated unlawfully, many plaintiffs employ the burden shifting method of presenting indirect evidence to prove unlawful discrimination established by the Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* burden shifting method, the plaintiff must:

> [first] . . . prov[e] by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant, 'to articulate some legitimate, non-discriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25)).

◼ At all times in this burden shifting method, "the plaintiff . . . bears the ultimate burden of persuasion." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). Even where the trier of fact does not [believe] or find credible the defendant's proffered reasons, the plaintiff must still "prove by a preponderance of the evidence that an illegal motive was at work" in order to prevail. *Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 522 (7th Cir.1994). "It is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Hicks,* 509 U.S. at 517, 113 S.Ct. at 2753. "The ultimate question [is] discrimination *vel non.* Once the defendant 'responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the factfinder must then decide' not . . . whether that evidence is credible, but 'whether the rejection was discriminatory.'" *Hicks,* at 517, 113 S.Ct. at 2753 (citing *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983)). *Loyd* further states:

> The trier of fact *may* infer intentional discrimination from its disbelief of the reasons put forward by the defendant and the elements of the prima facie case alone but is not *required* to do so. The presumption is rebutted by the production, not persuasiveness, of evidence of a nondiscriminatory explanation, and *qua* presumption, it drops from the case.

*Loyd,* 25 F.3d at 522.

**A. Whether the Plaintiff Establishes a Prima Facie Case of Discrimination Under the *McDonnell Douglas* Framework.**

◼ "A plaintiff may establish a prima facie case of intentional discrimination by offering evidence adequate to raise an inference that he was discharged on the basis of his race." *Rush,* 966 F.2d at 1113. In order to do this, the plaintiff must prove four elements: (1) he belongs to a protected class; (2) his job performance met the legitimate expectations of his employer; (3) in spite of his performance, he sustained an adverse employment action; and (4) similarly situat-

ed employees outside his protected group were treated more favorably. *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir. 1994); *Rush*, 966 F.2d at 1113–14 (citing *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir.1986)). The elements of the *McDonnell Douglas* prima facie case are not inflexible. *Cherry*, 47 F.3d at 228 (citing *Burdine*, 450 U.S. at 253 n. 6, 101 S.Ct. at 1093 n. 6). "To raise an inference of discrimination, the fundamental requirement is that a [plaintiff] 'must show that, as a [member of a protected group he] was treated differently than a similarly situation [person outside the protected group].'" *Cherry*, 47 F.3d at 228 (citing *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1003–04 (7th Cir.), *cert. denied*, ── U.S. ──, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994)).

 The instant case involves the elimination of an entire position rather than a reduction in force. The defendant MHAC eliminated its Resident Manager position. None of the persons serving as Resident Managers were retained, including the plaintiff. (DPFOF ¶ 22, Perry Aff. ¶ 9.) Thus, the defendant did not choose some employees to retain while discharging others, but eliminated an entire class of employees. However, the defendant did hire a person to fill the new position. In this situation, the second element of the *McDonnell Douglas* prima facie case changes focus. Where "a particular job position is entirely eliminated for nondiscriminatory reasons, for plaintiff to prevail against his employer, he must show that he was qualified for another available job with that employer, qualification for his current position is not enough." *Langston v. Carraway Methodist Hospitals of Alabama, Inc.*, 840 F.Supp. 854, 864 (N.D.Ala.1993) (citing *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1082–83 (11th Cir.1990)); *see also Bartz v. Agway, Inc.*, 844 F.Supp. 106, 111 (N.D.N.Y.1994). Thus, to make out his prima facie case, the plaintiff must show (1) he was a member of a protected class, (2) he was qualified for a position that the defendant had available at the time of the restructuring, (3) he suffered an adverse employment action, and (4) the defendant hired an equally qualified person who is not a member of the protected class.

 The plaintiff has failed to make out a prima facie case of discrimination under *McDonnell Douglas*. The plaintiff meets only two of the four elements: he is a member of a protected class, and he has sustained an adverse employment action. The plaintiff has not demonstrated that he was qualified for the newly created position of Resident Maintenance Manager and he has not demonstrated that someone with equal qualifications outside the protected group was hired as Resident Maintenance Manager. The plaintiff contends that he is qualified for and could have functioned in either newly created positions of Resident Maintenance Manager or Assistant Property Manager.[1] For the following reasons, the Court finds that the evidence simply does not support plaintiff's contention.

The Resident Maintenance Manager is "responsible for all maintenance and repairs for [a] cluster," of all of defendant's apartment buildings in a specified geographic area. (Perry Aff. at ¶¶ 14, 12.) Duties of the Resident Maintenance Manager include:

> scheduled maintenance work, regular inspection of the grounds, building and mechanical systems, performing daily tenant work orders, refurbishing vacant apartments, maintaining the apartment grounds, maintaining mechanical systems and appliances, making recommendations for physical repairs, capital improvements and supplies, maintaining an inventory of tools, equipment and supplies, and maintaining service records as necessary. (Perry Aff. at ¶ 14.)

The defendant required the following qualifications from an individual seeking this position: "training and experience in structural care, carpentry, appliance repair, and the maintenance and repair of mechanical systems including plumbing, electrical and heating, ventilation and air conditioning." (Perry Aff. at ¶ 14.) The Assistant Property Manager is responsible for "all of the leasing and management for [a particular] cluster."

---

1. The Court does not consider the plaintiff's qualifications for the newly created Community Management Coordinator because the plaintiff does not assert he is qualified for it.

(Perry Aff. at ¶ 13.) The duties of the Assistant Property Manager include:

> marketing the rental units, qualifying prospective tenants, preparing and administering all leases, monitoring budgeted maintenance, repairs and cleaning, ensuring compliance with code, tax credit and WHEDA requirements, maintaining leasing information files, and preparing reports for occupancy, budgeting, maintenance and lenders. (Perry Aff. ¶ 13.)

According to the plaintiff, he is "primarily ... self educated." (Collins Dep. at 130.) His self-education consists of reading books on "sociology, psychology, parapsychology, and clinical hypnosis." (Collins Dep. at 130.) Plaintiff cannot remember attending high school, college, or trade school, or ever being in the military. (Collins Dep. at 130-2, 133.) But, he asserts he has had "extensive informal training in property management, [i]ncluding HUD section 8 certification and re-certification" and that he is "trained in data entry and retrieval on preprogrammed computer systems." (April 15, 1996 Affidavit (hereinafter "Collins Aff.") at ¶ 3.) The plaintiff's past employment consists of his position as "Resident Caretaker" with the defendant, a similar position he held with defendant's precursor (Collins Aff. at 135), and an unspecified position with Wilson Cox Construction Company in Ripley, Mississippi. (Collins Aff.: Attached W-2 Forms.) The plaintiff further asserts he "worked in real estate rehabilitation with the Live Church, Ltd." in the early 1980s. (Collins Aff. at ¶ 4.) The plaintiff's actual work experience includes taking rental applications and turning them in to defendant; cleaning halls, windows, and doors; keeping the building secure; taking calls and handling any "business" in the building; and cleaning apartments after tenants moved. (Collins Dep. at 215-6.) The plaintiff repaired a sink, plunged toilets, did "some dry wall work," "a little" plastering and patching, and repaired and installed windows. (Collins Dep. at 218-9.) He did not repair or install furnaces, repair appliances, or do general plumbing. (Collins Dep. at 217-8.) The plaintiff asserts his work experience further includes "remodeling, wiring, plumbing, painting, weatherproofing houses and roofing." (Collins Aff. at ¶ 4.)

The plaintiff provides no evidence whatsoever beyond his unsworn statement of his property management and computer training nor of his experience in real estate reconstruction. Plaintiff must provide sufficient and "significantly probative" evidence. *Langenfeld,* 902 F.Supp. at 855 (citing *Branson,* 853 F.2d at 771-72). *See also Santiago,* 894 F.2d at 221 (citing *Wolf,* 870 F.2d at 1327). This evidence must be authenticated, it cannot be merely alleged. *See* Fed. R.Civ.P. 56. The plaintiff has not submitted depositions or sworn statements of former employers, former fellow employees, clients, teachers, or trainers. He has not submitted work product, or certificates of instruction. He has not submitted job descriptions, a resume, or any other document that would substantiate his assertions. The plaintiff has submitted unauthenticated copies of W-2 forms from Wilson Cox Construction Co., but there is nothing on the face of the W-2 to indicate what position the plaintiff in fact held with the company. The Court cannot infer his employment position. Thus, the plaintiff simply has not given the Court any evidence which would allow the Court to construe that the plaintiff has the requisite experience for either of defendant's newly created positions. Nonetheless, any doubts as to the genuine existence of plaintiff's work experience in real estate reconstruction must be resolved in plaintiff's favor, as plaintiff is the non-moving party. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553. However, even assuming that the W-2s raise a genuine issue of triable fact, there is still the fourth prong of the *McDonnell Douglas* prima facie case.

The plaintiff has not shown that defendant hired an equally qualified person who is not a member of the protected class. The defendant hired Timothy Laur as its Resident Maintenance Manager for the cluster of apartments of which the 2933-37 building is part. Mr. Laur is a white male. (Perry Aff. at ¶ 17, 5.) Mr. Laur applied for the position of Resident Maintenance Manager on July 15, 1994. (Defendant's Exhibit B.) Mr. Laur's application shows that he served in the military, that he has a high school diploma, that he has trade degrees in both plumbing and HVAC, and that he has special skills in "plumbing, electrical, carpentry, and

HVAC." (Defendant's Exhibit B.) Mr. Laur was previously employed as a "maintenance man" for an apartment complex. The defendant hired Virginia Pickens as its Assistant Property Manager for the same cluster of apartments. Ms. Pickens is an African-American female. Ms. Pickens applied for the position of Assistant Property Manager on August 4, 1994. (Defendant's Exhibit C.) Ms. Pickens' application shows that she holds a high school diploma and degrees in word processing and office administration; she has also pursued training as a nurse's aide. (Defendant's Exhibit C.) Ms. Pickens' application further shows that she, like Mr. Laur, has relevant experience. She worked as both assistant manager and manager for apartment agencies. In addition, she has two years' experience working with the IRS. (Defendant's Exhibit C.)

Far from being "equal," the qualifications of Mr. Laur and Ms. Pickens, both in education and actual experience, far surpass the qualifications of the plaintiff. In addition, Ms. Pickens, an African-American female, is a member of the same protected class as the plaintiff. The plaintiff does not meet the fourth element required for the *McDonnell Douglas* prima facie case and has failed to establish a prima facie case of unlawful employment discrimination.

**B. Whether the Defendant's Proffered Nondiscriminatory Reasons Rebut Plaintiff's Prima Facie Case.**

Even if the plaintiff had established a prima facie case of discrimination, the Court would nevertheless grant the defendant's motion because MHAC has proffered legitimate nondiscriminatory reasons for the plaintiff's termination. To rebut the plaintiff's prima facie case, the defendant must "articulate some legitimate, non-discriminatory reason for the employee's rejection." *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94. The defendant articulates two such reasons for its adverse employment action against plaintiff: 1) the defendant's restructuring and 2) the plaintiff's lack of qualifications for the newly formed positions created in the restructuring.

The defendant contends it eliminated the plaintiff's position in a company-wide restructuring pursuant to entering into a different market enterprise. Defendant "MHAC redevelops, rehabilitates and manages urban, low income housing;" but, before 1992, it had worked only with "double-family residences," or "duplexes." (Perry Aff. at ¶ 3.) The defendant's stated goal is to "expand redevelopment and management of [its] apartment operation by 200 units per year." (Perry Aff. at ¶ 4.) In September, 1993, defendant acquired its first apartment building. It has 36 units. The defendant assumed management of other buildings in the same area later that year and throughout 1994. By September, 1994, the defendant was managing six buildings and a total of 158 units in an area stretching from approximately the 2900 to the 3100 block of West Wells St. (Perry Aff. at ¶ 6.) The first building defendant acquired was the 2933–37 building which is the subject of this lawsuit. The defendant states that it realized its existing structure would not be adequate to support the kind of expansion it wanted to undertake; but, having had no actual experience in the management of larger apartment complexes, it had not yet decided how to structure its management for this new venture. (Perry Aff. at ¶¶ 7–8.) The 2933–37 building appears to have been a "test case." The plaintiff had filled a position somewhat similar to a resident caretaker position for the company that previously managed the building. It made sense to the defendant to retain him in that position until the defendant could take stock of and plan more appropriately for the venture it had embarked upon. In mid–1994, the defendant decided to structure its management on the same geographic basis it had constructed for the acquisition of the buildings themselves. Each cluster of buildings would have its own Resident Maintenance Manager, who would remain on-site, and its own Assistant Property Manager. A Community Management Coordinator position was created to foster community relations both between each cluster and its surrounding community and also among the tenants within each cluster. This structure, similar in design to the physical structure of the apartment complexes, seems to have been designed to both reinforce the communities it desired to foster and also to centralize,

streamline, and economize the defendant's operations.

The defendant further contends that the plaintiff was not qualified for the positions it created in its restructuring. The qualifications and responsibilities the defendant established for the newly created Resident Maintenance Manager and Assistant Property Manager positions have been fully identified and discussed. It is sufficient to note that the plaintiff's qualifications did not meet the defendant's standards and, in any event, the defendant hired individuals who were clearly more qualified and experienced than the defendant perceived the plaintiff to be. The Court takes a moment to note plaintiff's recalcitrant attitude during deposition and notes the utter lack of any evidence demonstrating that the plaintiff met the qualifications the defendant required, or that the plaintiff's qualifications surpassed those of the individuals the defendant hired instead of the plaintiff. If the plaintiff applied for either of these positions, the Court does not have the plaintiff's application submitted into evidence. If plaintiff has a resume, certification, or degree, work experience, work product, or references of any kind, the Court has not been presented with such evidence, and the Court cannot infer specific work experience from proffered W–2 forms without further evidentiary documentation. Moreover, the plaintiff's refusal to answer clearly even defendant's most basic questions about his education or work experience does not help to establish that the plaintiff had the qualifications the defendant required for the newly created positions.

■ The Court finds the defendant's proffered reasons for the plaintiff's termination wholly legitimate. *See LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 845 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (defendant employer has satisfied its burden of production where "[i]t has presented 'through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." (citing *Hicks,* 509 U.S. at 506, 113 S.Ct. at 2747 (emphasis in original))). *See also Heath v. Massey–Ferguson Parts Co.,* 869 F.Supp. 1379, 1395 (E.D.Wis.

1994), *rev'd on other grounds, Heath v. Varity Corp.,* 71 F.3d 256 (7th Cir.1995); *Langston,* 840 F.Supp. at 855–56; *Pearlstein v. Staten Island Univ. Hospital,* 886 F.Supp. 260, 268–69 (E.D.N.Y.1995). Therefore, even if the plaintiff had presented a prima facie case, which this Court did not find, the defendant has successfully rebutted plaintiff's prima facie case with its proffered legitimate, non-discriminatory reasons for its adverse employment action against the plaintiff.

### C. Whether the Plaintiff Establishes that the Defendant's Proffered Non–Discriminatory Reasons are Pretextual.

■ In the interests of completeness, the Court next moves to the third part of the *McDonnell Douglas* burden shifting method. Assuming but not finding that the plaintiff established a prima facie case, which the defendant rebuts, the "[p]laintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94. The plaintiff must show that the defendant's explanations have no basis in fact, that the defendant's explanation is not the real motivation for its adverse employment action against the plaintiff, or that the defendant's explanation is insufficient to warrant its adverse employment action against the plaintiff. *Lenoir,* 13 F.3d at 1133. In attempting to prove that the defendant's proffered reasons are pretextual, the plaintiff makes two claims: 1) that the new positions of Resident Maintenance Manager and Assistant Property Manager are merely renaming the old positions of "caretaker" and "resident manager," respectively; and 2) defendant did not know of plaintiff's education and ability at the time defendant terminated plaintiff and so could not have based the termination on plaintiff's lack of qualifications.

The plaintiff asserts that the newly created Resident Maintenance Manager position is merely a synonym for "caretaker," a position which the plaintiff held with the defendant and which he is capable of performing now. As evidence, plaintiff points to a document attached to his brief as "Exhibit D," and it

appears to be a flyer that the defendant MHAC issued to its tenants regarding the change in management. The document lists Tim Laur as "new caretaker." (Plaintiff's "Exhibit D.") Plaintiff asserts the same argument for the newly created Assistant Property Manager position. The document lists Sr. Alana as the "new Ass't Property Manager." (Plaintiff's "Exhibit D.") Both Mr. Laur and Sr. Alana are white. The document is not dated, but the Court can infer from the designation of Sr. Alana as "new Ass't Property Manager" that the document was generated after she was hired and before Ms. Pickens assumed her position as "Assistant Property Manager." However, a careful review of the record shows that the two positions defendant created are simply not merely the renaming of the plaintiff's old position.

The Resident Maintenance Manager and Assistant Property Manager clearly involve additional responsibilities and require additional technical abilities. The plaintiff himself admits that the job he was actually performing did not involve these additional responsibilities and technical abilities. The defendant hired the plaintiff as a "Resident Caretaker" to "act as the 'eyes and ears' of the building and perform basic cleaning and minor maintenance." (Perry Aff. at ¶ 9.) The plaintiff cleaned common areas and vacated apartments. He repaired a sink, plunged toilets, repaired and replaced windows, changed locks, and did some dry wall and plaster repair. He also kept the building secure. (Collins Dep. at 215–8.) In addition, the plaintiff accepted tenant applications on behalf of the defendant which he then turned over to the defendant, took calls, and "handled all the business in the building." (Collins Dep. at 216.) The plaintiff did not perform repair work on appliances, he did not change outlets or light fixtures, he did not do any furnace work, and he did not do any plumbing. (Collins Dep. at 217–8.) Plaintiff did not actually lease apartments. (Collins Dep. at 215.) Plaintiff's position involved responsibility only for one building. During the time of plaintiff's employment, the defendant's "General Maintenance Technician," Fred McKnight, actually maintained the 2933–37 building and Alice Galloway–Torres, defendants "General Property Manager," actually managed the building.

It is clear that responsibility for actual management and maintenance duties, beyond the less technical duties entirely contained to the 2933–37 building that plaintiff performed on site, fell to the defendant's existing management and, in particular, to Mr. McKnight and Ms. Galloway–Torres. In contrast with the duties the plaintiff actually performed, both newly created positions involve responsibility for an entire cluster of buildings, in this case, 6 buildings and 158 units, and require technical knowledge and ability the plaintiff had not performed in his work with the defendant and was not apparently capable of performing. Thus, the plaintiff's argument, that defendant's newly created positions merely rename plaintiff's already existing position, is without merit.

The plaintiff's second argument is that defendant was unaware that the plaintiff lacked the education and qualifications required for the newly created positions. The plaintiff alleges that the defendant had no evidence of the plaintiff's true education and capabilities before it took adverse employment action against him. "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749 (citing *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094). As the Court has previously noted, it finds the defendant MHAC's proffered reasons credible. Nonetheless, the Court will consider the evidence supporting plaintiff's second argument to determine whether it renders pretextual defendant's proffered reason that plaintiff was patently unqualified for the positions created in its restructuring.

The plaintiff, by his own admission, does not hold a high school diploma, any trade or college certification or degree, and has not had any schooling beyond the eighth grade. (Collins Dep. at 130–1.) The plaintiff stated that his self-education includes reading books on "sociology, psychology, parapsychology, and clinical hypnosis." (Collins Dep. at 132.) The Court further notes that there is no evidence indicating that the plaintiff applied for any of the newly created positions. The defendant restructured and in the process

eliminated the "Resident Caretaker" position in its entirety. (Perry Aff. at ¶ 19.) From the record, it is clear that *no one* who had formerly been a "Resident Caretaker" was retained for the newly created positions without at least applying for the position. If the plaintiff was in fact qualified to fill the positions the defendant created, it was his responsibility to bring this to the defendant's attention, either while in defendant's employ or while defendant was accepting applications and interviewing to fill the positions.

Furthermore, the defendant had the opportunity to view and judge the plaintiff's work while the plaintiff was employed by the defendant. The defendant was in a unique position to make judgments about the plaintiff's performance. The plaintiff asserts that the defendant should have simply retained him and changed his job title, then waited to see if he performed to the defendant's standards. The Court does "not sit as a super-personnel department that reexamines an entity's business decisions." *Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1220 (7th Cir.1991). The law "certainly allows employers to hire anyone they want, so long as they do not discriminate against anyone because of certain statutorily enumerated categories like race or color." *Kirk*, 22 F.3d at 139. "Misguided and unfair personnel assessments are not actionable under [the law] unless [race] played a role in the evaluation." *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159, 1164 (7th Cir.1994).

Finally, the person that the defendant eventually hired as its permanent Assistant Property Manager is Ms. Pickens, who is an African–American female. Ms. Pickens is a member of the same protected class which plaintiff asserts the defendant is discriminating against. The Court therefore finds that the plaintiff has failed to show that the defendant was more likely motivated by racial discriminatory reasons or that the defendant's proffered reasons were not credible. *Robinson*, 23 F.3d at 1163.

The plaintiff at all times bears the burden of proving the defendant's adverse employment action against him was based upon an impermissible criteria. *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749. The plaintiff must "prove by a preponderance of the evidence that an illegal motive was at work" in order to prevail. *Loyd*, 25 F.3d at 522. "The ultimate question [is] discrimination *vel non.*" *Hicks*, 509 U.S. at 517, 113 S.Ct. at 2753 (citing *Aikens*, 460 U.S. at 714, 103 S.Ct. at 1481). The evidence does not support the plaintiff's claim that the defendant's termination of him was motivated by racial animus. In conclusion, the plaintiff has failed to present any evidence whereby a reasonable jury viewing the evidence in a light most favorable to the plaintiff could find or infer race discrimination. There are no genuine issues of material fact, and therefore, plaintiff's cause of action cannot survive summary judgment and is dismissed.

## V. DEFENDANT'S COUNTERCLAIM

"With the resolution of [ ] plaintiff's federal claim[ ], it is within the court's discretion to dismiss the remaining state law claims. Indeed, it is the normal course to do so if the federal claims are dismissed before trial." *Weinberger v. State of Wisconsin*, 906 F.Supp. 485, 493 (W.D.Wis.1995) (citing *Wentzka v. Gellman*, 991 F.2d 423, 425 (7th Cir.1993)). The Court, therefore, dismisses defendant's claims for unpaid rent and conversion of the refrigerator.

## VI. CONCLUSION

After a careful review of the entire record and applicable law, the defendant's Motion for Summary Judgment is **GRANTED.** The plaintiff's claim against the defendant is **DISMISSED,** the defendant's counterclaim against the plaintiff is **DISMISSED,** and therefore, this case is **DISMISSED** in its entirety.

**SO ORDERED.**